WILLIAM BINGO AND CLARA BINGO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bingo v. Commissioner
Docket No. 4442-88
United States Tax Court
T.C. Memo 1991-248; 1991 Tax Ct. Memo LEXIS 291; 61 T.C.M. (CCH) 2782; T.C.M. (RIA) 91248; June 5, 1991, Filed *291 Decision will be entered under Rule 155. William Bingo and Clara Bingo, pro sese. William B. McCarthy, for the respondent. SWIFT, Judge. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to tax with respect to petitioners' joint Federal income taxes for 1979 through 1984 as follows: Additions to Tax, Secs. [1]
Year
Deficiency
6653(b)
6653(b)(1)
6653(b)(2)
6661
1979
$ 420,646
$ 210,323
$ --  --
$ --  1980
166,163
83,082
--  --
--  1981
435,863
217,932
--  --
--  1982
36,172
--   18,086
* 9,043
1983
269,751
--   134,875
* 67,438
1984
33,362
--   16,681
* 8,341
After settlement of *292 some issues, the primary issues for decision are: (1) Whether certain adjustments made by respondent to the income of a subchapter S corporation were proper; (2) whether investments in race horses and energy management systems were entered into with an actual and honest profit objective; and (3) whether petitioners are liable for additions to tax for fraud. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners resided in Boca Raton, Florida, at the time their petition was filed. Over the years, petitioner William Bingo (petitioner) has owned a number of businesses. He has been a stockbroker and a financial planner, and he has formed a number of subchapter S corporations through which he has promoted investments in abusive tax shelters. Also, during the years at issue and in other years, petitioners have invested on their own behalf in a number of abusive tax shelters, including shelters formed and promoted by petitioner. In 1975, petitioner formed Eastern Investors Geological Services, Inc. (Eastern), as a subchapter S corporation to promote and sell tax shelters. Petitioner was the sole shareholder of Eastern. Eastern offered investors the *293 opportunity to participate in government lotteries of noncompetitive oil and gas exploration and development leases on Federal lands that had no proven oil and gas reserves and that therefore were regarded as speculative oil and gas properties. The lotteries were conducted monthly or bimonthly by the U. S. Bureau of Land Management (BLM). In general, the typical financial objective of investors who participated in the BLM lotteries was to obtain oil and gas leases on land that had valuable but undiscovered oil and gas deposits. If, during the 10-year term of the leases, the land was determined to have potentially valuable oil and gas deposits, the value of the investors' leases might increase significantly. If such an increase in the value of the leases occurred, the leases could be sold by investors to oil or gas development companies for a substantial profit, and the investors could retain overriding royalty interests in the oil and gas produced from the land covered by the leases. Within 15 working days of the date on which BLM published lists of the leases to be included in the next lottery, investors wishing to participate had to file separate applications and to pay separate *294 filing fees with respect to each lease. The filing fee to participate in a lottery with respect to each lease was $ 10 in 1979 and 1980, $ 25 in 1981, and $ 75 in 1982, 1983, and 1984. BLM personnel conducted the lotteries and randomly drew a name from the pool of applicants for each lease. With respect to leases obtained under the BLM lotteries, in 1979 and 1980, and with respect to each acre of land covered by a lease, the total lease payment due each year was one dollar per acre. With respect to leases obtained under the BLM lotteries in 1981, 1982, 1983, and 1984, the total lease payment due each year was $ 1 per acre for the first 5 years of the lease, and $ 3 per acre for the second 5 years of the 10-year lease. Winning applicants in the lotteries with respect to each lease were required to make the total lease payment due with respect to the first year of each lease within 15 days or the lease would be offered to other participants in the lottery. In 1979, the maximum acreage included in a lease was 2,560. In 1980 and later years, the maximum acreage included in a lease was 10,240. The term of each lease was 10 years. During the years in issue, on the first working *295 day of each month in which a lottery was to be conducted, the various BLM regional offices would post written notices describing summarily the particular land and acreage that was to be included in the next lottery. The notices included only the serial number, location, and total acreage applicable to each lease. This limited information generally did not provide investors interested in participating in the lotteries sufficient information on which they could base a decision as to which of the various leases available in the lotteries they wished to apply for. Further complicating the investors' ability to participate in the lotteries was the fact that, after notices were posted, the investors only had 15 working days to file the applications for each lease. Accordingly, to assist investors in deciding which leases to apply for and to assist investors in filing the actual applications to participate in the BLM lotteries, various advisory and filing service companies were formed. [2] Eastern, among other things, was such a company, and (for fees that were grossly inflated over their value) Eastern provided investors both advisory and filing services. Generally, for a stated total *296 fee of $ 36,000 in 1979 and 1980, $ 48,000 in 1981, $ 36,000 in 1982, and apparently $ 36,000 in 1983 and 1984, Eastern would contract with investors to assist the investors for a period of 1 year to select leases available in the monthly or bimonthly BLM lotteries and to file applications on behalf of the investors to participate in the lotteries with respect to leases Eastern and the investors selected. Each investor was required to pay only $ 12,000 of the total fee upon entering into the contract with Eastern. The $ 24,000 or $ 36,000 balance of the stated total fee due Eastern was deferred and was reflected by either a 1-, 2-, 3-, or 4-year promissory note executed by each investor in favor of Eastern, bearing interest at either 7.5, 8, or 10 percent. A number *297 of investors contracted with Eastern to participate in the BLM lotteries through various tax shelter partnerships. The general fee structure and the term of the promissory notes associated with the contracts with Eastern through the partnerships vary somewhat from the general fee structure described above with respect to investors who contracted directly with Eastern. For example, in late 1982, petitioner Clara Bingo, through a partnership, invested or contracted with Eastern for Eastern's assistance in filing applications to participate in the BLM lotteries. In connection therewith, Mrs. Bingo paid $ 12,000 cash, and she signed a 7-year promissory note to the partnership for $ 37,000. The promissory note did not bear interest, and Mrs. Bingo had no stated personal liability to make any payments thereon until the expiration of the 7-year term of the note. Advisory and filing services in connection with the BLM lotteries comparable to those offered to investors by Eastern were available from other companies for approximately $ 5,000 to $ 6,000 per year. Petitioners and Eastern grossly overstated the value of Eastern's services in an attempt to provide themselves and other investors *298 significant and improper tax benefits in connection with investments through Eastern in the BLM lotteries. Even though the investors' promissory notes purported to be recourse in nature, petitioner informed investors that Eastern had no intention of enforcing the investors' debt obligations thereunder. For example, in a letter dated August 24, 1982, written to an investor, petitioner stated on behalf of Eastern with respect to the promissory notes as follows: We have no intention whatsoever to force payment of those notes, now or ever. Additionally, if investors won a lease in a BLM lottery, the investors, under circumstances not completely clear in the record, apparently could assign the lease to Eastern in full payment of any promissory notes they owed to Eastern. Further, if investors had not won a lease in a lottery, but wished to pay off the promissory note owed to Eastern, petitioner in some situations would arrange for worthless leases to be transferred to the investors, and the investors would then transfer such leases to Eastern in full payment of the investors' promissory notes. Based on the various understandings and arrangements to "pay off" the promissory notes, *299 it is clear that neither petitioners nor Eastern intended for the promissory notes to be enforced. Investors in Eastern's investment program in the BLM lotteries were told by petitioner and by Eastern that the full amount of the stated fee, including the principal amount of the promissory notes given to Eastern, were fully deductible on the investors' Federal income tax returns in the year the investors entered into the investment program with Eastern. In exchange for the fee to be paid Eastern by the investors, Eastern, within the 1-year term of the contract, was to select on behalf of each investor and to file a stated number of applications to participate in the BLM lotteries. If an application filed by Eastern on behalf of an investor "won" the lottery with respect to a particular lease, the investor had to decide whether to make the first annual lease payment due on the lease. Because of the large amount of acreage involved in some of the leases, the annual lease payment due to BLM with respect to a lease could be very substantial, even though the measure of the lease payment was only $ 1 per acre per year. The filing fees paid to BLM by Eastern on behalf of the investors *300 for the right to participate in each lottery were funded by Eastern out of the cash portion of the fees received by Eastern from investors. The annual lease payments due BLM on a lease (where a lease was won in a lottery and was retained by an investor) were to be paid by the investors directly to BLM and were not paid by Eastern out of the fees paid by the investors to Eastern. Apparently to allow investors to reduce their financial risks of obtaining leases of worthless oil and gas properties, Eastern, for an additional fee of $ 1,200, offered each investor participating in its program in 1979 through 1982 the opportunity to purchase from Eastern a put option. Each put option entitled the investor, at the end of the 1-year contract with Eastern, to sell to Eastern for $ 23,000 a 35-percent interest in any and all leases (including overriding royalty interests) the investor acquired during the year with Eastern's assistance in the BLM lotteries. If a put option was exercised requiring Eastern to purchase a 35-percent interest in each of the investor's leases, the investor retained the remaining 65-percent interest in each lease. Upon payment to investors of the put option exercise *301 prices, Eastern normally would be expected to file with BLM a notice of the assignment to Eastern of the 35-percent interests in the leases. Eastern, however, did not always file with BLM the notices of assignment of the 35-percent interests. For example, Eastern's records indicate that investors exercised put options on leases numbered C-28987 and W-70431, but Eastern does not appear in BLM's records as having any ownership interest in either of these leases. Also, contrary to the stated $ 23,000 to be paid by Eastern upon exercise by an investor of a put option, the record indicates that Eastern often actually paid investors a lesser amount upon exercise by investors of the put options. During Eastern's taxable years ending October 31 of 1979, 1980, and 1981, Eastern paid investors $ 367,500, $ 190,426, and $ 168,382, respectively, in connection with the exercise by investors of put options. On November 2, 1981, Eastern deposited 13 checks totaling $ 144,612 into its bank account. The checks were received from various investors in Florida, New York, Oklahoma, and Wyoming, and the checks apparently represented payment of fees associated with Eastern's participation on behalf *302 of the investors in the BLM lotteries to be held in early November of 1981. The checks were dated between October 21 and October 30, 1981. Using certified checks dated in early November of 1981, Eastern paid $ 65,125 in filing fees to various BLM offices with respect to the November 1981 BLM lotteries. Eastern's books and records erroneously indicate that these certified checks were purchased in late October of 1981. During its taxable year ending October 31, 1984, Eastern purportedly transferred to Plateau West Exploration, Inc. (Plateau), a number of overriding royalty interests Eastern had acquired from investors upon the exercise of put options and from other transactions. Purportedly, in exchange for the transfer to Plateau by Eastern of the overriding royalty interests, petitioner received 5 million shares of Plateau stock and an option to purchase an additional 5 million shares of Plateau stock. Petitioner also was made director and president of Plateau, while petitioner Clara Bingo (Mrs. Bingo) was appointed secretary. The record is unclear as to other aspects of this transaction, and no explanation is given as to why the Plateau stock was transferred to petitioner *303 instead of to Eastern. Throughout the years at issue, Eastern paid petitioners' family members for work allegedly done for Eastern. Mrs. Bingo and petitioners' two sons, Jeff and William, were paid by Eastern the amounts set forth below during the years indicated: 1979 1980 1981 1982 1983 1984 Mrs. Bingo
--  --  --  $ 2,400
$ 2,400
$ 1,950
Jeff
$ 1,365
$ 1,330
$ 2,700
$ 2,650
$ 2,850
$   750
William
$ 1,365
$ 1,295
$ 2,700
$ 2,875
$ 4,875
$   750
For the years in issue, petitioners' and Eastern's books and records were incomplete. On its Federal income tax returns for its taxable years ending October 31, 1979, 1980, and 1981, prepared on the cash method of accounting, Eastern claimed current deductions for $ 367,500, $ 112,426, and $ 114,782, respectively, of the amounts paid investors on the exercise by the investors' put options. Eastern deducted currently these amounts on its Federal income tax returns for each year, and (Eastern being a subchapter S corporation) these deductions were passed through to petitioners' Federal income tax returns. Respondent determined that at the end of each of Eastern's taxable years Eastern still *304 owned the 35-percent leasehold interests it had received upon exercise of the put options and therefore that Eastern had improperly reflected the above amounts as current deductions. Respondent accordingly disallowed the deductions claimed. Respondent also determined that for Eastern's taxable years ending October 31, 1982 and 1984, Eastern was entitled to a current deduction of $ 99,600 and $ 30,500, respectively, relating to the transfer or abandonment of its leasehold interests in certain leases acquired from investors. Eastern treated the 13 checks in the total amount of $ 144,612 that were deposited into its bank account on November 2, 1981, as income reportable in its taxable year ending October 31, 1982. Eastern treated the $ 65,125 in certified checks that were purchased by Eastern in early November of 1981 for use as filing fees in connection with the BLM lotteries that were to be held that month as deductible expenses for its taxable year ending October 31, 1981. Respondent treated the $ 144,612 in checks that Eastern deposited into its bank account on November 2, 1981, as income reportable in Eastern's taxable year ending October 31, 1981, on the ground that Eastern *305 actually received the checks prior to the end of its 1981 taxable year (i.e., prior to October 31, 1981). Respondent also disallowed the $ 65,125 deduction claimed on Eastern's Federal income tax return for its taxable year ending October 31, 1981, with respect to the filing fees relating to the November 1981 BLM lotteries, on the ground that the checks were not actually purchased until November of 1981 (namely, in Eastern's taxable year ending October 31, 1982). Respondent disallowed for all years at issue all of Eastern's claimed deductions relating to amounts paid to Mrs. Bingo and to petitioners' sons. For its taxable year ending October 31, 1983, Eastern claimed a current deduction of $ 62,500 with respect to BLM lease number W-78049. Eastern's interest in this lease was terminated by BLM on June 1, 1985, due to the failure of Eastern to make the lease payment due. Petitioners (and other investors who participated in the BLM lotteries through Eastern's investment program) claimed on their Federal income tax returns for the years at issue current deductions for the full amount of the promissory notes executed in connection with their participation through Eastern in the BLM *306 lotteries. Respondent disallowed these deductions, and petitioners have conceded the adjustments. Race Horses
In 1982, petitioner formed WMB Management Corp. (WMB) as a subchapter S corporation to make investments in race horses. Petitioner was the sole shareholder of WMB. In November of 1982, WMB purchased a one-third interest in a horse named Bear Hug for $ 4,000. In 1982, WMB paid $ 288 in expenses relating to Bear Hug, but WMB realized no income from the racing activities of Bear Hug. In November of 1983, WMB paid $ 13,125 for a one-eighth interest in two race horses of allegedly higher quality than Bear Hug -- a horse named Suitcase and a horse named Oriental Breeze. In 1983, WMB paid $ 6,144 for boarding and other expenses relating to Bear Hug, Suitcase, and Oriental Breeze, but WMB apparently realized no income in 1983 from the racing activities of the three horses. In 1984, WMB realized income of $ 1,186 and expenses of $ 8,928 relating to the racing activities of the three horses. In 1984, WMB sold its interest in Bear Hug for $ 815, and in 1986, WMB sold its interests in Suitcase and Oriental Breeze for a total price of $ 6,147. Prior to 1982, neither WMB *307 nor petitioners had any experience with race horses. During 1982 through 1986, petitioners personally were not involved in the training or racing activities of the horses. During 1983 and 1984, petitioner was a member of the U.S. Trotting Association and held a license for harness racing from the State of Pennsylvania. Petitioners occasionally would bet on horses while at the race track. On their Federal income tax returns for 1982, 1983, and 1984, petitioners claimed Schedule C losses (including depreciation) of $ 1,280, $ 7,664, and $ 13,462, respectively, relating to the racing activities of Bear Hug, Suitcase, and Oriental Breeze, as those expenses flowed through the Federal income tax returns of WMB. Respondent disallowed the losses petitioners claimed in excess of the income generated from the activities of the three horses. Energy Management Systems
In late 1982, petitioner made an investment in a tax shelter program involving energy management systems. Under the program offered by Economic Planning Associates, Inc. (EPA), investors purchased for a grossly inflated price energy management systems and leased the systems to owners of buildings. End-user lease payments *308 for the systems were to be based on savings in the endusers' utility bills attributable to the use of the energy management systems. Petitioner was shown general profit projections purportedly relating to the energy management systems, which projections emphasized the tax benefits to be claimed by the investors. The stated purchase price for one energy management system offered under the EPA program was $ 337,500. Without any apparent negotiations, petitioner in December of 1982 in connection with the purchase of the energy management system from EPA paid EPA a downpayment of $ 50,000 in cash, and petitioner signed a 15-year promissory note for $ 287,000. [3] Although the record is not entirely clear as to the payments due on the promissory note, apparently during the entire 15-year term of the promissory note, payments of principal and interest (simple interest at the bank prime rate) were to be made from a percentage of end-user lease payments, if any, received by petitioner with respect to the equipment. At the end of the 15-year term, petitioner allegedly was liable for the remaining balance of principal and interest due on the promissory note. EPA retained a security interest *309 in the underlying equipment that comprised the energy management systems. The energy management system petitioner purchased from EPA in December of 1982 previously had been purchased by EPA for a total price of $ 45,000. The record does not indicate from whom EPA purchased the system or the terms of payment by EPA of the $ 45,000. At the time of the investment, petitioner entered into a management agreement with Associated Energy Consultants, Inc. (Associated Energy), to install and to operate the energy management system, to collect lease payments received from end users, and to remit to petitioner any profits, after expenses and payments on the promissory note. Petitioner also was to fund, apparently from a share of end-user lease payments, a maintenance and repair account of $ 1,000 with regard to the system. As compensation for its services, *310 Associated Energy was to receive 15 percent of end-user lease payments. In December of 1983, without any apparent negotiations, WMB also purchased from EPA a one-half interest in an energy management system. The stated purchase price for WMB's interest in this system was $ 200,000, one half of which was to be paid in cash and one half of which was to be reflected by a 7-year promissory note, bearing simple interest at 10 percent per year and secured by the equipment. Installment payments due on the promissory note apparently were payable only from end-user lease payments, which in turn were based on savings in the end-user's utility bills attributable to the use of the system. WMB also entered into a management contract with Associated Energy and agreed to fund a maintenance and repair account of $ 10,000 with regard to this system. In September of 1984, WMB had an opportunity to purchase another energy management system. The proposed price for this system was $ 11,000. In December of 1984, petitioner, rather than WMB, purchased this energy management system for a total cash price of $ 11,000 and had it installed on the commercial building in which WMB's offices were located. *311 In October of 1984, petitioner apparently became disappointed with the performance of the first energy management system he purchased from EPA, and a dispute arose between petitioner and EPA over payments due on the promissory note. On December 10, 1987, EPA filed a complaint in the Circuit Court of the 15th Judicial Circuit in and for Palm Beach County, Florida, concerning payments allegedly due under the promissory note. The case was submitted to a panel of arbitrators whose opinion was adopted by the circuit court. The circuit court found that the agreement was entered into for the illegal purpose of evading Federal income taxes and that the agreement and associated promissory note were unenforceable as contrary to public policy. The circuit court found that the stated price of $ 337,500 failed to represent the true value of the system and that the inflated price was set by the parties for the purpose of establishing a fraudulent tax shelter. On their 1982 joint Federal income tax return, with regard to the energy management system purchased in that year, petitioners claimed a tax basis of $ 337,500, a $ 50,625 Schedule C loss, and energy and investment tax credits. On their *312 1983 joint Federal income tax return, petitioners claimed a Schedule C loss of $ 72,135 also attributable to the energy management system purchased in 1982. On their 1984 joint Federal income tax return, petitioners claimed a Schedule C loss of $ 82,586 attributable to all three energy management systems. Respondent disallowed the Schedule C losses for each year in excess of the gross income relating to the energy management systems. Respondent also disallowed the energy and investment tax credits claimed by petitioners with respect to the energy management systems. Miscellaneous
In 1979, Mrs. Bingo purchased a few pieces of furniture at reduced wholesale prices and sold the furniture to Eastern for $ 3,250. Petitioners did not report any portion of the $ 3,250 in sales proceeds on their 1979 joint Federal income tax return. Respondent included the full $ 3,250 in petitioners' income for 1979, and, due to lack of substantiation, respondent did not allow petitioners an offset to the $ 3,250 in sales proceeds to reflect petitioners' cost basis in the furniture. In 1982, 1983, and 1984, Mrs. Bingo did not receive any earned income. In each year, however, petitioners each *313 contributed $ 2,000 to an Individual Retirement Account (IRA) established in their respective names. Petitioners claimed a deduction on their joint Federal income tax returns for each year with respect to the total $ 4,000 contributed to the IRA accounts. Respondent disallowed the $ 2,000 deduction claimed each year with respect to the $ 2,000 contribution made to Mrs. Bingo's IRA account. On their joint Federal income tax returns for 1982 and 1983, petitioners claimed a deduction of $ 20 and $ 40, respectively, for two-earner married couples. Respondent disallowed this deduction. Respondent also determined the additions to tax relating to fraud with respect to petitioners' joint Federal income tax returns for 1979 through 1984. OPINION Eastern
Petitioners' theories for challenging respondent's disallowance of the current deductions Eastern claimed each year with respect to its cost of purchasing the 35-percent leasehold interests in the BLM leases (upon exercise of put options by the investors) are not clear. Petitioners apparently claim that Eastern is entitled to a current abandonment loss deduction under section 165(a) with regard to all or substantially all of *314 its costs each year of purchasing the leasehold interests (namely, $ 367,500, $ 112,426, and $ 114,782, respectively, in Eastern's taxable year ending October 31 of 1979, 1980, and 1981.) Alternatively, petitioners apparently claim that Eastern should be entitled, in its taxable year ending October 31, 1984, to an abandonment loss deduction under section 165(a) for Eastern's costs of purchasing the 35-percent leasehold interests in those leases with respect to which Eastern's overriding royalty interests purportedly were transferred to Plateau in 1984. Respondent argues that the evidence does not establish that Eastern abandoned its 35-percent leasehold interests in the leases during each of the years the interests were purchased from the investors. Further, respondent argues that the transfer to Plateau in 1984 of overriding royalty interests in some of the leases does not give rise to a loss deduction with regard to Eastern's 35-percent leasehold interests. On the record before us, we conclude that Eastern did not abandon the leasehold interests in the years of purchase. The mere fact that Eastern did not register with the BLM the receipt of some of the 35-percent leasehold interests *315 it received does not establish Eastern's abandonment thereof. As between Eastern and the investors, Eastern certainly continued to own the 35-percent interests in the leases, and the investors apparently still owned the remaining 65-percent interests in the leases. The evidence simply does not support petitioners' claim to abandonment loss deductions with respect to Eastern's leasehold interests in the years the interests were purchased. With regard to petitioners' alternative argument that Eastern should be allowed a loss deduction in its 1984 taxable year for its cost of purchasing the leasehold interests transferred to Plateau, petitioners offered only skeletal evidence concerning the nature of the transfer to Plateau, the nature of Eastern's and petitioners' relationship to Plateau, and the value of the consideration received. Due particularly to the transfer of the Plateau stock to petitioner, rather than to Eastern, the transaction is suspect. On the basis of the limited evidence before us relating to the 1984 purported transfer to Plateau of overriding royalty interests in certain of the leases, we conclude that Eastern is not entitled to a loss deduction in 1984 with *316 respect to any of these leasehold interests. Cash basis taxpayers are required to report income in the taxable year the income is received. Sec. 451(a). When cash basis taxpayers are paid by checks, the income reflected by the checks generally is includable in income when the checks are delivered to the taxpayers, not when the checks were mailed. See Avery v. Commissioner, 292 U.S. 210, 78 L. Ed. 1216, 54 S. Ct. 674 (1934). Cash basis taxpayers are allowed deductions in the year in which payment is made of the related expenses. For Federal income tax purposes, delivery of checks generally will constitute payment. Clark v. Commissioner, 253 F.2d 745, 748 (3d Cir. 1958), affg. in part and revg. in part a Memorandum Opinion of this Court; Commissioner v. Bradley, 56 F.2d 728 (6th Cir. 1932); Estate of Dillingham v. Commissioner, 88 T.C. 1569, 1572 (1987), affd. 903 F.2d 760 (10th Cir. 1990); Estate of Spiegel v. Commissioner, 12 T.C. 524 (1949). The mailing of properly addressed checks may constitute delivery to the addressees. Estate of Witt v. Fahs, 160 F. Supp. 521 (S.D. Fla. 1956). *317 See also Estate of Spiegel, supra at 528, quoting from Thomas v. Prudential Insurance Co. of America, 104 F.2d 480 (4th Cir. 1939). With regard to whether the $ 144,612 in checks deposited by Eastern on November 2, 1982, into its bank account should be included in Eastern's income for its taxable year ending October 31, 1981, or in Eastern's taxable year ending October 31, 1982, petitioners contend that Eastern received the 13 checks totaling $ 144,612 on Monday, November 2, 1981, the same day the checks were deposited into Eastern's bank account. Respondent speculates that Eastern received the checks on or before Saturday, October 31, 1981, and that the checks therefore should be included in Eastern's income for its taxable year ending October 31, 1981. We find it highly unlikely that third-party checks dated October 30, 1981, would have been received by Eastern before Monday, November 2, 1981. The checks were mailed to Eastern by various investors located throughout Florida, New York, Oklahoma, and Wyoming. In light of the dates on the checks, the date of the deposit, petitioner's testimony, and the lack of any evidence to the contrary, we conclude *318 that the checks dated October 30, 1981, were received by Eastern in November of 1981, and therefore that the related income was properly reported in Eastern's taxable year ending October 31, 1982. On the limited evidence before us, we also conclude that the remaining checks making up the balance of the $ 144,612 also were received by Eastern in November of 1981 and therefore that the related income was properly reported in Eastern's taxable year ending October 31, 1982. Petitioners contend that the $ 65,125 in certified checks purchased by Eastern in November of 1981 with respect to filing fees due BLM for the November 1981 lotteries should be allowed as a deduction in Eastern's 1981 or 1982 taxable year. Petitioners contend that the 21 checks were mailed in October of 1981. Respondent notes that the BLM announcement of leases available in the November 1981 lotteries was not available until the first working day in November (namely, Monday, November 2, 1981), making it highly unlikely that Eastern could have known what amount of filing fees to submit and what leases to apply for prior to that date. Respondent also notes the November 1981 dates on the checks. Petitioners argue *319 that petitioner, in late October 1981, obtained advance copies of the BLM lists of leases available in the November 1981 lotteries, and petitioner alleges that he purchased the certified checks in October of 1981. On the evidence before us, we conclude that the checks representing the $ 65,125 were purchased and mailed by Eastern in November of 1981. Respondent's disallowance of the $ 65,125 deduction claimed with respect to the checks for Eastern's taxable year ending October 31, 1981, is sustained, and the deduction was properly allowed by respondent for Eastern's taxable year ending October 31, 1982. Respondent's disallowance of Eastern's claimed deductions for salaries paid to Mrs. Bingo and to petitioners' sons are sustained for all years at issue on the ground that the evidence does not establish that services were actually rendered for Eastern by Mrs. Bingo or by petitioners' sons. Petitioners have failed to meet their burden of proof on this issue. Rule 142. Petitioners have offered no proof to substantiate the $ 62,500 deduction claimed by Eastern for its taxable year ending October 31, 1983, pertaining to lease W-78049. We sustain respondent's disallowance of this *320 deduction. Rule 142(a). Race Horses and Energy Management Systems
Section 183 limits the deductibility of losses relating to activities not engaged in for profit to the amount of income derived from the activities. In order to deduct losses without being subject to the limitation of section 183, a taxpayer must enter into and engage in an activity with an actual and honest objective of making a profit. Flowers v. Commissioner, 80 T.C. 914, 931 (1983); Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). A list of nine nonexclusive factors to be considered in determining whether an activity is engaged in for profit is set forth in section 1.183-2(b), Income Tax Regs.
Neither WMB nor petitioners had any experience with horse races before purchasing Bear Hug, Suitcase, and Oriental Breeze, and neither WMB nor petitioners apparently made any effort to acquire horse racing expertise thereafter. There is no indication that WMB or petitioners, before purchasing the horses, investigated or researched any of the horses' bloodlines, prior winnings, or projected future earnings. *321 On the evidence before us, we find that WMB and petitioners lacked a profit objective with regard to the horse racing activities, and we sustain respondent's adjustments relating thereto. With regard to petitioner's and WMB's investments in energy management systems, profit projections related thereto emphasized the tax benefits to be claimed. Petitioner and WMB accepted the terms of the investments with no apparent negotiations. Without any apparent justification, the first system purchased by petitioner was greatly marked up over the price at which it had been previously purchased by EPA. A significant portion of the purchase price associated with the first energy management system purchased by petitioner and the energy management system purchased by WMB was reflected by inflated promissory notes with respect to which petitioner and WMB had no firm payment obligations. In light of the Florida circuit court's judgment, petitioner's stated payment obligation on his promissory note relating to the system he purchased in 1982 was unenforceable. With regard to the energy management system purchased by petitioner in 1984, the evidence is incomplete and not credible. Petitioner *322 has not satisfied his burden of proof with regard thereto. Rule 142. We conclude that petitioner's and WMB's investments in the three energy management systems were not entered into nor engaged in with an actual and honest profit objective, and we sustain respondent's disallowance of the tax losses and credits claimed with respect to these investments for 1982, 1983, and 1984. Miscellaneous Adjustments
To reflect Mrs. Bingo's cost basis in the furniture sold to Eastern in 1979, petitioners claim an offset against a portion of the $ 3,250 Mrs. Bingo realized on the sale. Under the authority of Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930), we find that Mrs. Bingo's cost basis in the furniture was $ 500. Section 219(c) provides limits on deductions for contributions by married individuals to IRA accounts. Under this section, among other things, married individuals filing joint returns are entitled to a maximum deduction of $ 250 with respect to contributions to an IRA by a spouse who has no earned income during the year. In the present case, Mrs. Bingo had no earned income during 1982, 1983, and 1984. Amounts paid to Mrs. Bingo by Eastern *323 did not constitute compensation for services rendered by Mrs. Bingo, and therefore they do not constitute earned income. Petitioners are entitled to a $ 250 deduction with respect to Mrs Bingo's IRA contributions in each of the years 1982, 1983, and 1984. For 1982 and 1983, section 221 allowed a deduction for "two-earner married couples." The deduction allowed was 10 percent [4] of the lesser of $ 30,000 or the qualified earned income of the spouse with the lower qualified earned income for the taxable year. Because Mrs. Bingo had no earned income for 1982 and 1983, petitioners are not to be considered a two-earner couple. Petitioners, therefore, are not entitled to this deduction for 1982 or 1983. Additions to tax
With respect to 1979 through 1984, section 6653(b) and (b)(1) provides for an addition to tax of 50 percent of the underpayment of tax in any taxable year if any portion of the underpayment is due to fraud. For 1982, 1983, and 1984, section *324 6653(b)(2) provides for an addition equal to 50 percent of the interest payable under section 6601 on that portion of the underpayment attributable to fraud. Respondent bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). Respondent's burden may be met by showing both that an underpayment of tax exists and that the taxpayer intended to conceal, mislead, or otherwise prevent respondent from collecting the tax owed. Korecky v. Commissioner, 781 F.2d 1566 (11th Cir. 1986), affg. a Memorandum Opinion of this Court; Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968). Respondent must show circumstances proving more than a mere suspicion of fraud. Carter v. Campbell, 264 F.2d 930, 935 (5th Cir. 1959). Fraud is never to be assumed or imputed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Because, however, direct proof of a taxpayer's intent is often not available, circumstantial evidence may be used in proving fraud. Rowlee v. Commissioner, 80 T.C. 1111 (1983). The requisite fraudulent intent may be inferred from a pattern of *325 conduct. See Spies v. United States, 317 U.S. 492, 499, 87 L. Ed. 418, 63 S. Ct. 364 (1943). To aid in determining whether a taxpayer acted with fraudulent intent, certain badges of fraud have been identified including: Understatements of income, the failure to keep adequate books and records, the failure to file Federal income tax returns, the concealing of assets, and the failure to cooperate or the making of false statements to the tax authorities. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986); Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980). Petitioners substantially underpaid their taxes for the 6 years before us. Neither petitioners nor Eastern maintained complete and adequate books and records. Tax benefits were claimed on petitioners' joint Federal income tax returns that were known by petitioners to be improper. We note particularly petitioners' claim to deductions based on Mrs. Bingo's participation through a partnership and through Eastern in the BLM lotteries, and the reliance on inflated promissory notes in spite of the fact that petitioners knew the promissory notes were greatly inflated and were not intended to be *326 enforced. On the record before us, respondent has established by clear and convincing evidence that petitioners are liable for the additions to tax for fraud under section 6653(b) and (b)(1) for each of the years before us. We so hold. Only those portions of the understatements found herein for 1982, 1983, and 1984, that are attributable to the adjustments to Eastern's income, and to the energy management systems invested in by petitioner and by WMB, and to the disallowance of the current deductions claimed by petitioners in connection with Mrs. Bingo's participation in the BLM lotteries are attributable to fraud, and the section 6653(b)(2) additions with respect thereto are sustained. Respondent also asserts the section 6653(b)(2) addition with respect to the many other adjustments he made for the years 1982, 1983, and 1984. Essentially no evidence was offered regarding these adjustments other than the stipulated facts that the adjustments were either conceded or settled, a brief identification of the adjustments, and the amount of the adjustments. On this record, we are not able to determine if such adjustments are attributable to fraud. Respondent's determination under section *327 6653(b)(2) with respect thereto is not sustained. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest payable on that portion of the underpayments attributable to fraud.↩
2. For a further general discussion of the BLM lotteries of noncompetitive oil and gas exploration and development leases, see Nicolazzi v. Commissioner, 79 T.C. 109, 111-113 (1982), affd. 722 F.2d 324↩ (6th Cir. 1983).
3. The $ 500 difference between the stated purchase price and the total of the cash paid and the principal amount of the promissory note is not explained in the record.↩
4. For 1982, 5 percent was allowed instead of 10 percent.↩